**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION AT COLUMBUS**

JAMES A. BRENSON, JR.,         :  Case No. 2:24-cv-4201

       Petitioner,            :

                         :  Judge Edmund A. Sargus, Jr.

vs.                      :  Magistrate Judge Kimberly A. Jolson

WARDEN, RICHLAND
CORRECTIONAL INSTITUTION    :

                         :

       Respondent.

---

## ORDER & REPORT AND RECOMMENDATIONS

James A. Brenson, Jr., a state prisoner proceeding without counsel, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. The matter is before the Court to consider the Petition (Doc. 1), the Return of Writ (Doc. 12), Brenson's Reply (Docs. 16, 17), and the state court record. (Docs. 10, 10-1, 11-1). Also before the Court is Brenson's Motion for an Evidentiary Hearing for Breach of Contract. (Doc. 18). It is **RECOMMENDED** that this action be **DISMISSED** as time-barred and it is **ORDERED** that Brenson's Motion for an Evidentiary Hearing (Doc. 18) be **DENIED**.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This matter has a complicated history that is relevant to the Court's determination that Brenson's habeas petition is untimely and ineligible for the actual innocence gateway.

A.    Trial

On April 16, 2008, a Delaware County, Ohio grand jury indicted Brenson and William Allen on charges related to Norman Herrell's death.  Brenson was charged with eight counts, including aggravated murder, murder, kidnapping, aggravated robbery, and tampering with evidence.  (Doc. 10 at PageID # 79–88).  Seven counts carried repeat violent offender specifications based on a representation that Brenson had a prior murder conviction.  (*Id.*).  Notably, this was the second time Brenson was indicted for Herrell's murder.  He was indicted in August 2000, but the indictment was dismissed in early 2001 for further investigation.  (Doc. 11-1 at PageID# 2746–2749).

Brenson sought to dismiss the 2008 indictment, arguing his speedy trial rights were violated with the delay in the second indictment, the state had abused the grand jury process by telling the jury that he had been charged with a crime that legally could not form the basis of a repeat violent offender specification,[1] and the state violated his Sixth Amendment rights by failing to tell him that a warrant had been issued for his arrest before he voluntarily appeared to testify before the grand jury.  (Doc. 10 at PageID# 202–215, 216–220, 261–278).  The trial court found that Brenson's speedy trial and Sixth Amendment rights were not violated and any prejudice he may have suffered by the state improperly seeking repeat violent offender specifications went away when the state voluntarily dismissed the specifications.  (*Id.* at PageID# 230–235, 292–304).  Brenson also unsuccessfully attempted to sever his trial from his co-defendant, William Allen.  (*Id.* at PageID# 89–95, 185–193).

---

[1]    The Northern District of Ohio granted Brenson's writ of habeas corpus, finding his adult conviction for the same murder for which he had been subject to a determination of delinquency in juvenile court violated the Double Jeopardy clause. *Brenson v. Havener*, 403 F. Supp. 221 (N.D. Ohio 1975).

2

Brenson was tried by a jury and convicted on July 22, 2008.[2] (Doc. 10 at PageID# 305–311, Doc. 11-1 at PageID# 1849–4182). The trial court sentenced Brenson to life plus ten years imprisonment, with parole eligibility after serving twenty years. (Doc. 10 at PageID# 320–323, Doc. 11-1 at 4183–4213).

### B.     Direct Appeal

On August 25, 2008, Brenson filed a notice of appeal with the Fifth District Court of Appeals ("Court of Appeals"). (Doc. 10 at PageID# 324). The Court of Appeals found that the following facts were adduced at trial:

{¶ 2} On June 11, 2000, at approximately 10:00 p.m., Norman "Duck" Herrell was at his home talking on the telephone with his ex-wife, Phyllis Gaskins. A knock on the door at Herrell's house interrupted the conversation. Herrell told Gaskins that he would call her back, but he never called.

{¶ 3} The next morning, Herrell did not report to work at his furniture store, J & D furniture. His son, Michael Herrell, became concerned, and tried repeatedly to call his father throughout the day. When he still could not reach Herrell by the afternoon, Michael went to Herrell's house to check on him.

{¶ 4} Michael testified at trial that when he arrived at Herrell's house, the door was unlocked and there were blankets hanging over the windows in the living room. Michael stated that his father was an immaculate housekeeper and that when he entered the home on June 12th, the house was a mess, it appeared to have been ransacked, and Herrell's gun cabinet was open, and his guns were missing. Michael found his father lying face down on the floor in a pool of blood in the basement. He called 911.

{¶ 5} The arriving officers searched the house for additional victims or suspects. No one else was found to be in the residence. They also checked for, but did not find, evidence of a forced entry.

{¶ 6} After determining that Herrell's death was a homicide, the Delaware Police Department contacted the Ohio Bureau of Criminal Investigation (B.C.I.) for assistance in processing the crime scene.

{¶ 7} While processing the scene, officers recovered several pieces of evidence. They recovered two knives, including a small brown knife from the love seat in the

---

[2]     Following the verdict, the state dismissed Count Eight, tampering with evidence. (Doc. 10 at PageID# 314–317).

basement, which appeared to have blood on it. After DNA tests were run on the knife, it was determined that, the blood present on the knife was that of Herrell.

{¶ 8} Officers also recovered a pair of brown cloth gloves, which were saturated with blood. DNA recovered from those gloves matched both Herrell's DNA and subsequently that of Brenson's co-defendant William Allen. Additionally, authorities recovered a long-sleeved, blue shirt that later was determined to possess the DNA of Allen, as well as his wife, Silvy Allen.

{¶ 9} Officers also recovered a guest receipt from a Meijer store in Oregon, Ohio, which is near Toledo. They were able to determine that a person who identified himself as K.W. Yowpp made the purchase and a return on June 9, 2000. K.W. Yowpp is a known alias of Brenson. Brenson's fingerprint was retrieved from the receipt.

{¶ 10} Brenson's fingerprint was also recovered from an envelope at Herrell's house containing a dog tag.

{¶ 11} While searching Herrell's home, authorities observed that many items in the house had been disturbed, including pictures taken off walls, chairs moved from the kitchen to rooms that had blankets over the windows, rooms that had been ransacked, as if the intruder(s) were looking for something. They also observed a large quantity of illegal fireworks in the basement of the house.

{¶ 12} Several days following the initial search of Herrell's house, authorities returned to the house after learning that Herrell had a safe hidden in the house. Herrell's family had not disclosed to the authorities that the safe existed, but after authorities asked about the safe, Herrell's daughter, who was the only person besides Herrell with the combination to the safe, opened it for them. Contained within the safe were silver coins, old stopwatches, a deed to rental property owned by Herrell, and some jewelry.

{¶ 13} Franklin County Deputy Coroner, Dorothy Dean, testified that Herrell had been stabbed fifty-one times. Three of the stab wounds were potentially fatal.

{¶ 14} During the investigation of Herrell's murder, officers discovered that Herrell and Brenson spent several months in prison together at Marion Correctional Institution in 1981. Herrell's children were also familiar with Brenson, having seen him with Herrell before. Herrell's children identified Brenson as "Muhammad."

{¶ 15} Sometime in 2001, officers learned that Ohio Highway Patrol Trooper Brandon Spaulding stopped Brenson during the evening hours of June 11, 2000, on U.S. 23 South in the area of Bucyrus, Ohio. Trooper Spaulding testified at trial that he was running license plates on vehicles at a rest area, when he ran the license plate on Brenson's red Ford F–150 at approximately 8:51 p.m. The truck was registered to Mustafa Muhammad, which is Brenson's son. At that time, Trooper

Spaulding believed that the license plate on the truck actually belonged on a different vehicle. The trooper pulled his cruiser up behind Brenson's vehicle and got out of his cruiser to approach Brenson. Upon approaching Brenson, Trooper Spaulding noted that Brenson was sitting in the vehicle alone.

{¶ 16} Trooper Spaulding determined that he had conveyed one of the letters on the license plate incorrectly to the dispatcher and started to explain the mistake to Brenson. Brenson became angry and began swearing at the trooper, claiming that the trooper was harassing him because of his race. Trooper Spaulding noticed that Brenson's front license plate was in the dashboard. He warned Brenson to attach the license plate to the front of the vehicle. Eight minutes after he initiated the stop, Trooper Spaulding cleared the call and left the rest stop.

{¶ 17} According to Brenson, he then went to the next exit to obtain materials to attach the license plate to the front of the truck. Brenson testified in 2002 and 2008 before the Delaware County grand jury that he was on his way to Delaware, Ohio, to purchase fireworks from Herrell. He also stated in his 2008 grand jury testimony that he purchased zip ties to secure the license plate to the front of the truck.

{¶ 18} In March 2001, the police recovered Brenson's truck and found no blood in the truck. They did find that his front license plate was attached to the front of the truck with a coat hanger.

{¶ 19} At trial, Phyllis Gaskins testified that when she was speaking on the phone with Herrell on the night of June 11, 2000, he told her that two "white guys" were at the door. She later retracted her statement, claiming that Herrell would not have called the men "white guys." Brenson later told authorities that he saw a van with "two white guys" come up to Herrell's house as he was leaving. He claimed they were in a white van with Cuyahoga County license plates on it.

{¶ 20} Brenson told the grand jury that he left Herrell's house that night and returned to Toledo, arriving home around 11:00 or 12:00 that night.

{¶ 21} Brenson also testified before the grand jury that he and Allen had been friends since 1979, that they both lived in Toledo, and that they had taken numerous trips together over the years. At trial, the prosecution called numerous friends and family members of Brenson to testify that they had seen Brenson with Allen multiple times throughout the years.

{¶ 22} In October 2005, Allen became linked to Brenson through an informant. Allen reported being the victim of a felonious assault. As a result, the police obtained a blood sample from Allen. Subsequently, police were able to link Allen's DNA to the shirt found in Herrell's kitchen. Allen was also found to have a 1–in–30 chance of being a contributor to the DNA found on the blood-soaked cloth gloves in Herrell's kitchen.

{¶ 23} Prior to being informed that his DNA was found at the scene of a crime, during an interview with the police in 2005 when he was the victim of a felonious assault, Allen informed the police that he was good friends with Brenson, whom he identified as "Muhammad." When the police showed Allen a photograph of Herrell, his demeanor changed, and he looked at the picture and stated that he did not know him.

{¶ 24} A car dealer in Toledo testified at trial that in April 2000, Allen purchased a car for $600 and then sold it back in July 2000 for $200. Shanica Masadeh, Silvy Allen's daughter, testified at trial that Silvy and Allen suddenly moved to Florida in July 2000, and that Silvy gave custody of her to Silvy's grandmother because Silvy could not support her. The police obtained records from Florida that Allen and Silvy both worked for a temporary agency from August 8, 2000, to December 20, 2000.

{¶ 25} Brenson's first defense attorney, Thomas Beal, testified at trial that he had a conversation with the Delaware County Prosecutor on December 3, 2000, that the indictment against Brenson would be dismissed, most likely by December 15, 2000. Allen then returned to Ohio in late December 2000.

{¶ 26} Brenson was originally indicted for the murder of Herrell in Delaware County Common Pleas Case Number 00–CR–I–07–0195 on July 28, 2000. That case was dismissed without prejudice on January 16, 2001, at the request of the prosecution for further investigation.

{¶ 27} Seven years later, a second indictment was issued on April 16, 2008, wherein both Brenson and Allen were indicted on two counts of aggravated murder, unclassified felonies, in violation of R.C. 2903.01(A) and R.C. 2903.01(B), respectively, one count of murder, an unclassified felony, in violation of R.C. 2903.02(B), one count of kidnapping, a felony of the first degree, in violation of R .C. 2905.01(A)(2), one count of kidnapping, a felony of the first degree, in violation of R.C. 2905.01(A)(3), one count of aggravated robbery, a felony of the first degree, in violation of R.C. 2911.01(A)(3), and one count of aggravated robbery, a felony of the first degree, in violation of R.C. 2911.01(A)(1).

*State v. Brenson*, 2010-Ohio-4645, ¶¶ 2–27, *appeal allowed, judgment vacated,* 128 Ohio St. 3d

396 (2011), (Doc. 10 at PageID# 457–463).

Brenson's brief to the Court of Appeals raised fourteen assignments of error. (*Id.* at

PageID# 331–389). On September 28, 2010, the Court of Appeals issued a decision affirming the

conviction, but granting relief on Assignment of Error No. 14, finding the trial court should have

merged certain counts for sentencing. (*Id.* at 456–580*)*. Brenson's subsequent motion for reconsideration was denied. (*Id.* at 581–594).

After the Court of Appeals' decision, Brenson filed a Notice of Appeal with Supreme Court of Ohio and a memorandum in support of jurisdiction. (*Id.* at PageID# 595–673). The Supreme Court of Ohio accepted jurisdiction on the propositions of law on the sentencing errors raised as Assignment of Error #14 with the Court of Appeals. (*Id.* at PageID# 687). The Supreme Court of Ohio vacated the Court of Appeals' decision and remanded the matter for reconsideration in light of *State v. Johnson*, 128 Ohio St. 3d 153 (2010). On remand, the Court of Appeals found that the two kidnapping counts and two aggravated robbery counts should have been merged for sentencing. (Doc. 10 at PageID# 689–695). On April 15, 2011, the Court of Appeals remanded the matter to the trial court for resentencing. (*Id.*).

The trial court did not resentence Brenson until more than eleven years later, on June 14, 2022. (*Id.* at PageID# 1351–1354). Discussed below, the delay had a significant impact on the adjudication of Brenson's federal petitions for habeas corpus relief.

### C.    First Habeas Petition (2:11-cv-01146)

On December 22, 2011, Brenson filed a petition for habeas corpus relief in this Court that raised thirteen claims challenging his 2008 convictions related to Herrell's murder ("First Habeas Petition"). (*Id.* at PageID# 697–803). Benson claimed (1) his right to a speedy trial was violated by the eight-year delay between his initial indictment and eventual trial; (2) his due process rights were violated by the eight-year delay in bringing him to trial; (3) he was prejudiced by the trial court's refusal to sever his trial from that of Allen; (4) his 2008 grand jury testimony was obtained in violation of his right to counsel and should have been suppressed; (5) the prosecution abused the grand jury process by failing to tell Brenson that charges had been filed against him one hour

7

before his 2008 testimony to the grand jury; (6) his right to an impartial jury was denied by the trial court's refusal to dismiss jurors who had been exposed to pre-trial publicity regarding this case; (7) the trial court abused its discretion and denied Brenson his right to a fair trial by failing to grant mistrials twice after the jury was improperly exposed to prejudicial information; (8) the trial court erred in permitting the testimony of Brenson's prior trial attorney, (Att. Beal), because his testimony could be relevant if the jury used it to impermissibly stack inferences; (9) in a case where the defendant had given three prior statements to the police and his credibility in those statements was a key issue, should the jury have been given transcripts of those statements to take back into the jury room during deliberations, where they could pour over the statements for any minor inconsistencies; (10); the trial court erred by permitting extensive evidence regarding prior crimes, wrongs and bad acts by Brenson; (11) he was denied his right to effective assistance of trial counsel; (12) he was denied a fair trial by the cumulative effect of the numerous errors in his trial; (13) the verdict of guilty was against the manifest weight of the evidence. (*Id*.).

The Court denied Brenson's petition on the merits. (Case No. 2:11-cv-01146; Docs. 48, 52). The Court granted a certificate of appealability on claims one, three, four and five. (Case No. 2:11-cv-01146; Doc. 52). The Sixth Circuit affirmed the denial of habeas relief but expressed its concern about the prosecution's use of the grand jury process.[3] *Brenson v. Coleman*, 680 F. App'x 405, 410 (6th Cir. 2017), (Doc. 10-1 at 899–906). The United States Supreme Court denied Brenson's petition for a writ of certiorari. (Doc. 10-1 at 907–960).

---

[3] "With respect to petitioner's grand jury appearance in 2008, the district court found 'the State's actions here deeply concerning.' The prosecutor knew that a complaint and arrest warrant had issued that morning charging petitioner with aggravated murder. Nevertheless, he permitted petitioner to testify without informing him of this development. In our view, this decision walks a fine ethical line between technical legality and the spirit of our criminal justice system, and we would urge prosecutors to approach that line with caution to ensure that an accused's rights are sufficiently protected." *Brenson v. Coleman*, 680 F. App'x 405, 410 (6th Cir. 2017).

### D.    State Postconviction Proceedings

Following his First Habeas Petition, Brenson filed a pleading entitled "Motion to Set Aside Convictions or Order a New Trial" with the Delaware County Court of Common Pleas.  (*Id.* at PageID# 961–982).  Brenson asserted he should be granted a new trial based on the following new evidence:

(1) A pathology report challenging Dr. Dorothy Dean's determination of time of death (*id.* at PageID# 962);

(2) Dr. Dorothy Dean gave extensive testimony that was not included in an expert report, in contravention of Supreme Court of Ohio precedent (*id.*);

(3) Evidence technician, Michele Yezzo, conspired with Detective Leatherman to frame Brenson for murder (*id.* at PageID# 963);

(4) Detective Leatherman concealed that he was investigating two other suspects who were known armed robbers (*id.*);

(5) The state failed to disclose known credibility issues of evidence technician, Michele Yezzo.  (*id.*).

The Delaware County Court of Common Pleas denied Brenson's motion, finding it untimely.  (*Id.* at PageID# 1014–1019).

Particularly, the court found that Brenson failed to meet the requirements of Ohio's statute for postconviction petitions filed more than 365 days after the trial transcript is lodged with the Court of Appeals during direct appeal, O.R.C. § 2953.23(A)(l) & (2).  (*Id.* at PageID# 1016).  The court also found that Brenson failed to meet the requirements under Criminal Rule 33(B) for a motion for a new trial filed more than 120 days after the verdict.  (*Id.* at PageID# 1017).  The court rejected Brenson's argument that he could prove his innocence, concluding that issues raised in his pleading were speculative or did not constitute "new evidence."  (*Id*. at PageID# 1017–1018).

Brenson appealed.  (*Id.* at PageID# 1020–1059).  The Court of Appeals dismissed the appeal as untimely and denied his subsequent request for a delayed appeal.  (*Id.* at PageID# 1021,

1060–1070, 1093). Brenson filed a Notice of Appeal and memorandum in support of jurisdiction with the Supreme Court of Ohio (*id.* at PageID# 1094–1109), which declined jurisdiction. (*Id.* at PageID# 1117).

E. **Second Habeas Petition (2:22-cv-01416)**

On March 8, 2022, Brenson filed another petition for federal habeas corpus relief in this Court ("Second Habeas Petition"). (*Id.* at PageID# 1118, 1134–1154). The Court determined that the Second Habeas Petition was successive and transferred it to the Sixth Circuit. (*Id.* at PageID# 1164–1169). While the matter was pending at the Sixth Circuit, the Delaware County Court of Common Pleas resentenced Brenson pursuant to the Court of Appeals 2011 remand order. (*Id.* at PageID# 1351–1354; Doc. 11-1 at PageID# 4214–4233). Due to this development, the Sixth Circuit remanded the matter to this Court for reconsideration of the order concluding that the Second Habeas Petition was successive. (Doc. 10-1 at PageID# 1348–1350).

The Court determined that Brenson's new sentence rendered his Second Habeas Petition second in time, but not successive. (Case No. 2:22-cv-01416; Doc. 12). The Court dismissed Brenson's Second Habeas Petition, however, because the direct appeal of his resentencing (discussed below, Section "F") was still pending. (*Id.*).

F. **Resentencing**

On June 14, 2022, the Delaware County Court of Common Pleas held a resentencing hearing. (Doc. 10-1 at PageID# 1351–1354; Doc. 11-1 at PageID# 4214–4233). The court merged the proper counts pursuant to the Court of Appeals' ruling, but Brenson's ultimate sentence remained the same. (*Id.*).

Brenson appealed to the Court of Appeals, asserting a single assignment of error: "the trial court erred when it caused a 12-year delay between remand and re-sentencing; a violation of his

10

Sixth Amendment right to a speedy trial and a violation of due process." (Doc. 10-1 at PageID# 1369–1385). On April 18, 2023, the Court of Appeals issued an opinion affirming Brenson's conviction and sentence. (*Id.* at PageID# 1386–1395). Brenson filed a Notice of Appeal and memorandum in support of jurisdiction with the Supreme Court of Ohio (*id.* at PageID# 1396–1412), which declined jurisdiction on August 1, 2023. (*Id.* at PageID# 1447).

### G.    Motion to Reopen Appeal

On June 16, 2023, Brenson filed a Rule 26(B) Application to Reopen his appeal, asserting: (1) Appellate counsel was ineffective for conceding "lawful" imprisonment which precluded a showing of prejudice and invalidated the raised assignment of error; (2) Appellate counsel was ineffective for failing to raise a loss of jurisdiction to sentence Brenson, occasioned by the near thirteen-year delay in sentencing; (3) Appellate counsel was ineffective for failing to raise a lack of notice of a sentencing hearing; and (4) Appellate counsel was ineffective for failing to challenge the imposition of consecutive sentences. (*Id.* at PageID# 1448–1477). The Court of Appeals denied Brenson's application. (*Id.* at PageID# 1481–1485). Brenson sought further relief with the Supreme Court of Ohio, which declined jurisdiction. (*Id.* at PageID# 1486–1507, 1517).

## II.    CURRENT FEDERAL HABEAS PROCEEDINGS

On November 4, 2024, Brenson filed the instant federal habeas petition (Third Habeas Petition). He asserts four grounds for relief:

> **GROUND ONE**: Brenson was denied his right to due process of law when his irregular action for new trial was denied without a hearing and recast by the court in a way which was totally a disadvantage to the petitioner.

> **Supporting Facts:** Brenson submitted an unrefuted, new pathology report, from a distinguished pathologist placing Norman Herrell's time of death on the morning of June 12, 2000, making it an impossibility for Brenson to have committed the murder as he was approximately 200 miles away in a Toledo hospital.

**GROUND TWO:**    Brenson was denied the right to effective assistance of counsel.

**<u>Supporting Facts</u>:**    Brenson's counsel was ineffective for failing to investigate, and to procure an expert witness regarding the timing of Herrell's death, or to assist in the cross-examination of the State's pathologist, Dr. Dorothy Dean; trial counsel did not object to the prosecutor asking Dr. Dean (the pathologist in this case) questions that were not a part of the expert's written report submitted to him prior to trial; trial counsel was told by petitioner he was innocent of the charges and declared his innocence to the grand jury and told the previous counsel he was innocent, and wanted counsel to prove it in court. Trial counsel never tried to investigate petitioner's claims of innocence and simply allowed the prosecutor to present their case.

**GROUND THREE:**    Prosecutorial misconduct denied Brenson due process of law and a fair trial.

**<u>Supporting Facts</u>:**    The prosecution encouraged Dr. Dean to testify to issues not recorded in her written report, to wit, the time of death of the victim.

**GROUND FOUR:**    Brenson's right to due process of law was violated by the trial court's prejudicial recharacterizing of irregular motion for a new trial.

**<u>Supporting Facts</u>:**    The trial court prejudicially recast Brenson's irregular motion for a new trial, which resulted in a higher pleading standard without notice and affected his right to appeal.

(Doc. 1 at PageID# 6–11).

On March 31, 2025, Respondent filed a Return of Writ. (Doc. 12). Respondent contends that the Third Habeas Petition is time-barred. (*Id.* at PageID# 4265–4274). Alternatively, Respondent argues that Grounds One and Four are procedurally defaulted and non-cognizable in federal habeas review. (*Id.* at PageID# 4275, 4281). Brenson has asserted the actual innocence gateway, claiming that new evidence in the form of a report from pathologist Dr. Todd Grey, challenges the time of death offered into evidence by the state at trial. (Doc. 1-1 at 17–21).

Respondent argues that Brenson's evidence does not qualify as "new" and does not meet the threshold for the actual innocence gateway. (Doc. 12 at PageID# 4267–4274).

### III.    THE PETITION IS TIME-BARRED.

Under 28 U.S.C. § 2244(d)(1), as amended by § 101 of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, a person in custody under a state court judgment must file an application for a writ of habeas corpus within one year from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Nothing in the record suggests that § 2244(d)(1)(B) and (C) apply to Brenson's case. (Docs. 1, 1-1, 16, 17) (raising no state-created impediments or newly recognized and retroactively applicable constitutional rights). Consequently, Brenson's Third Habeas Petition is governed by the one-year statute of limitations set forth in 28 U.S.C. § 2244(d)(1)(A).

Applied here, Brenson's conviction became final on October 30, 2023, when the 90-day period for seeking a petition for a writ of certiorari to the United States Supreme Court challenging

the denial of his direct appeal of his resentencing expired.[4]  *See Smith v. Ohio, Dep't of Rehab. & Correction*, 331 F. Supp. 2d 605, 613 (N.D. Ohio 2004), *aff'd but criticized sub nom. Smith v. State of Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426 (6th Cir. 2006) (citing *Bronaugh v. Ohio*, 235 F.3d 280, 283 (6th Cir. 2000)).  The statute of limitations expired one year later, on October 30, 2024.  Brenson waited until November 4, 2024, to file this habeas corpus petition.  Therefore, it is untimely.

### A.    Equitable Tolling

No equitable tolling principles or exceptions save Brenson either.  Beginning with tolling, AEDPA's limitations period can be tolled if the habeas petitioner "shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing."  *Holland v. Fla.*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

Here, Brenson does not make any equitable tolling arguments.  (*See* Doc. 1, PageID# 14–15; *see also* Docs. 1-1, 16, 17).  Nor does the record support such a finding.  Brenson did not diligently pursue his rights.  He failed to timely appeal the denial of his postconviction motion (*See* Doc. 10-1 at PageID# 1093).  The Supreme Court of Ohio declined jurisdiction on his appeal of the resentencing on August 1, 2023, and he waited 461 days to file the Third Habeas Petition.  What's more, he does not say that any extraordinary circumstance prevented him from filing this

---

[4]     While the Supreme Court of Ohio declined jurisdiction on his Rule 26(B) Application on October 24, 2023, Brenson is not entitled to tolling for the time during which he could have petitioned for certiorari from the denial of his Rule 26(B) application.  *See Lopez v. Wilson*, 426 F.3d 339, 340–41 (6th Cir. 2005) (saying a Rule 26(B) application is a post-conviction procedure and not part of the direct review process that tolls the statute of limitations); *see also McComb v. Warden, Marion Corr. Inst.*, No. 3:24-CV-123, 2025 WL 1756890, at *5 (S.D. Ohio June 25, 2025), *report and recommendation adopted*, No. 3:24-CV-123, 2025 WL 2550171 (S.D. Ohio Sept. 3, 2025), *report and recommendation adopted*, No. 3:24-CV-123, *McComb v. Warden, Marion Corr. Inst.*, No. 3:24-CV-123, 2025 WL 2550171 (S.D. Ohio Sept. 3, 2025).

case on time. (Docs. 1, 1-1, 16, 17). "Absent compelling equitable considerations, a court should not extend limitations by even a single day." *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 561 (6th Cir. 2000), quoting *Johnson v. U.S. Postal Serv.*, 863 F.2d 48 (6th Cir. 1988).

### B. Actual Innocence

In addition to equitable tolling, "[a] habeas petitioner is entitled to an equitable exception to AEDPA's one-year statute of limitations if he makes a credible showing of actual innocence." *Davis v. Bradshaw*, 900 F.3d 315, 326 (6th Cir. 2018) (citing *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013)); *Souter v. Jones*, 395 F.3d 577, 599 (6th Cir. 2005). This type of actual-innocence claim "does not by itself provide a basis for relief . . . but is instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup v. Delo*, 513 U.S. 298, 315 (1995). Like equitable tolling, this exception is applied sparingly, and a petitioner bears the burden of demonstrating entitlement to the exception. *See Davis*, 900 F.3d at 326; *Ata v. Scutt*, 662 F.3d 736, 741 (6th Cir. 2011). The standard is "demanding" and "permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006) (citing *Schlup*, 513 U.S. at 327); *see also McQuiggin*, 569 U.S. at 385.

To demonstrate the actual innocence that would allow a court to consider a time-barred constitutional claim, a habeas petitioner must present "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]" *Connolly v. Howes*, 304 F. App'x 412, 417 (6th Cir. 2008) (quoting *Schlup*, 513 U.S. at 316). A court presented with new evidence must consider it in light of "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."

15

*Id.* (quoting *House*, 547 U.S. at 538).  In order to grant a petitioner's gateway-based claim of actual innocence, a court must be persuaded that "in light of the new evidence, no juror, acting reasonably, would have voted to find [petitioner] guilty beyond a reasonable doubt." *McQuiggin*, 569 U.S. at 385 (citing *Schlup*, 513 U.S. at 329); *Connolly*, 304 F. App'x at 417.  "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

In his Third Habeas Petition, Brenson argues that he is eligible for the actual innocence gateway based on an expert report from pathologist, Dr. Todd Grey.  (Doc. 1 at PageID# 14–15, Doc. 1-1 at PageID# 17–21, Doc. 1-2).  In his Traverse, Brenson complains that the Respondent failed to address his argument concerning the new evidence related to evidence about technician Michele Yezzo's credibility problems and Detective Leatherman's concealment of evidence of other suspects.  (Doc. 16 at PageID# 4303–4304).  These two claims are not included in Brenson's Third Habeas Petition[5] (*see* Docs. 1, 1-1) and claims included for the first time in a Traverse are not properly before the Court.  *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) ("Because the penalty-phase insufficiency argument was first presented in Tyler's traverse rather than in his habeas petition, it was not properly before the district court, and the district court did not err in declining to address it").

The pathologist report from Dr. Todd Grey, dated August 21, 2020, states that "opinions on the time of death are at best an estimate based on highly variable factors." (Doc. 1-2 at PageID# 39).  Dr. Grey opines that "both external environmental as well as endogenous temperature can drastically affect the development and progression of rigor [mortis] and decomposition." (*Id.*).  Further, Dr. Grey, opines that "it is not clear" that the "prosecutor . . . discussed and explored the

---

[5]      It appears that Brenson is referring to allegations he made in his Second Habeas Petition, but it was dismissed without prejudice.  Brenson failed to re-allege those claims in his Third Habeas Petition.

limits of . . . opinion about time of death . . . with Dr. Dean." (*Id.*).  Dr. Grey criticizes Dr. Dean's testimony on time of death because "there is no indication that a formal collection and review of all of the possible evidence relevant to such a determination was done."  (*Id.* at PageID# 39–40). Dr. Grey ultimately concludes that evidence supports a finding that Herrell was killed on the morning of June 12, 2000, including that "rigor was accelerated by both environmental and possibly endogenous elevated temperature," and the victim's known behavior:

> According to the victim's grandson, Aden Herrel, the decedent was known to rise fairly early in the morning, let out his dogs, take his potassium supplements and eat a breakfast that he may have had cooking overnight in a crock pot. At autopsy, Dr. Dean recovered five relatively intact pills from the victim's stomach. It was subsequently determined that these were wax matrix-based potassium supplements. Along with these pills were approximately 200 cc of partially digested food with some identifiable fragments of vegetable material. The decedent's grandson testified that his breakfast would often consist of a vegetable base with some form of meat flavoring (ham hock or pork belly). The stomach contents and pills would be consistent with the victim having engaged in his usual morning behavioral routine prior to death. Additionally, the victim's dogs were found in a closed bedroom with no evidence of the dogs having defecated or urinated and food in their bowl would suggest they had been let out and fed that morning in the decedent's usual fashion.

(*Id.* at PageID# 40).

To begin, Respondent argues that Dr. Grey's report does not qualify as "new evidence" for purposes of the actual innocence argument because it relies on evidence that was introduced at trial.  (Doc. 12 at PageID # 4267–4271).  But the Sixth Circuit recently referred to a similar expert report as "new" when evaluating the actual innocence exception.  *See Harris v. Akers*, No. 24-5983, 2025 WL 1256024, at *2 (6th Cir. Apr. 8, 2025) (referring to expert pathologist report that based opinion on police, autopsy, and laboratory reports, as "new evidence").[6]  Accordingly, the Court treats Dr. Grey's report as "new evidence."

---

[6]     The District Judge had granted the petitioner's objection to the Report and Recommendations on this issue, finding that the expert pathologist report was new evidence, "…the Sixth Circuit accepts evidence as "new," for *Schlup*

In any event, Brenson cannot meet the high bar for the actual innocence gateway. After considering all the evidence, old and new, the Court cannot conclude that no reasonable juror would have voted to find Brenson guilty. *House*, 547 U.S. at 538; *McQuiggin*, 569 U.S. at 385 (citing *Schlup*, 513 U.S. at 329); *Connolly*, 304 F. App'x at 417.

The state's pathologist, Dr. Dorothy Dean, conducted Norman Herrell's autopsy and testified at trial. (Doc. 11-1 at PageID# 2391–2457). She testified on direct examination that rigor mortis appears after 3–4 hours, reaches maximum effect at 12 hours, and persists for another 12 hours. (*Id.* at PageID# 2404). Dr. Dean testified that she was not asked to provide a time of death in this case and the time of death on the death certificate is the time of pronouncement. (*Id.* at PageID# 2404–5). Dr. Dean testified that when she examined Herrell's body rigor mortis was present, but it was easily broken. (*Id.* at PageID# 2408). She also testified that heat affects the onset of rigor mortis, increasing the time of onset. (*Id.* at PageID# 2405). Dr. Dean testified that Herrell's stomach contained partially digested food that resembled vegetables and potassium supplements. (*Id.* at PageID# 2406, 2430).

On cross-examination, Dr. Dean testified that it was impossible to pinpoint the exact time of death under the circumstances. (*Id.* at PageID# 2438). Dr. Dean was asked by William Allen's counsel to provide a time of death, and she responded, "He could have died maybe 24 hours before

---

purposes, when it was not previously presented at trial. *See Hubbard v. Rewerts*, 98 F.4th 736, 743 (6th Cir. 2024), *cert. denied sub nom. Hubbard v. Tanner*, 145 S. Ct. 1201 (2025) … In *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 427 (6th Cir. 2003), the Sixth Circuit considered an affidavit filed during a habeas proceeding, which opined that expert trial evidence supporting the previous conviction could not be made with reasonable medical certainty, and thus, the experts wrongly testified at trial." *Harris v. Green*, No. 2:22-CV-131-REW-MAS, 2024 WL 4491637, at *5 (E.D. Ky. Oct. 15, 2024), *certificate of appealability denied*, No. 2:22-CV-131-REW-MAS, 2024 WL 6843193 (E.D. Ky. Nov. 6, 2024), and *certificate of appealability denied sub nom. Harris v. Akers*, No. 24-5983, 2025 WL 1256024 (6th Cir. Apr. 8, 2025), *certificate of appealability denied*, No. 2:22-CV-131-REW-MAS, *Harris v. Green*, No. 2:22-CV-131-REW-MAS, 2024 WL 6843193 (E.D. Ky. Nov. 6, 2024), and *certificate of appealability denied sub nom. Harris v. Akers*, No. 24-5983, 2025 WL 1256024 (6th Cir. Apr. 8, 2025).

I saw him, or any time before that, the time he was last known to be alive.  I can't narrow it any further than that." (*Id.* at PageID# 2444).  During cross-examination by Brenson's counsel, Dr. Dean testified that she conducted the autopsy at 10:00 a.m. on June 13, 2000 (*id.* at PageID# 2450) and Herrell could have died at 10:00 a.m. on June 12, 2000 "or earlier." (*Id.*).

On re-direct examination, Dr. Dean stated that she had not given a time of death before her trial testimony. (*Id.* at PageID# 2455).  She agreed with the prosecutor that important information to determine the time of death was that Herrell last spoke on the phone at 10:10 p.m. on June 11, 2000, and was unreachable by phone at 8:47 a.m. on June 12, 2000. (*Id.* at PageID# 2456).  Dr. Dean testified that range of time fit her estimated time of death. (*Id.*).

Herrell's grandson, Arlen Herrell, testified that it was his grandfather's normal routine to wake up, feed the dog, and cook breakfast. (*Id.* at PageID# 2543).  Arlen Herrell testified that his grandfather would start cooking in his crockpots at night, including greens with pork, and usually went to sleep around 8:30 or 9:00 p.m. (*Id.* at PageID# 2556–2558).  Arlen Herrell testified that except for his diabetes medicine, his grandfather usually took his medicine in the morning. (*Id.* at PageID# 2573–2574).

Michael Herrell, Norman Herrell's son, testified that his father never locked his Jack Russell terrier, "Slick," in the bedroom. (*Id.* at PageID# 2109).  When Michael Herrell found his father's remains on June 12, 2000, he also found Slick locked in the bedroom. (*Id.* at PageID# 2119–2120, 2180–2181).

The parties stipulated that Brenson was admitted to the hospital at the Medical College of Ohio on June 12, 2000, at 9:41 a.m. and was discharged against medical advice on the same day at 2:17 p.m. (*Id.* at PageID# 3978).

During Sergeant Leatherman's testimony, he summarized the state's physical evidence against Brenson: a Meijer receipt with Brenson's fingerprint, a Meijer return receipt with Brenson's palm print,  a dog tag envelope that first entered Herrell's house in 1996 with Brenson's fingerprint, and an envelope, not found at the crime scene, which was addressed to Michael Herrell and had Brenson's DNA on it.  (*Id.* at PageID# 3808–3809).  The state also introduced evidence from Brenson's grand jury testimony that he admitted going to Herrell's house during the evening hours of June 11, 2000, to purchase illegal fireworks.  (*Id.* at PageID# 3387–3431, 3395–3427). William Allen could not be excluded from the DNA sample that was found on a shirt and gloves in Herrell's home.  (*Id.* at PageID# 3240–3321).  Allen was a known associate of Brenson (*id.* at PageID# 2892–2893, 2906, 2910, 2940, 3334), but unknown to Herrell's family.  (*Id.* at PageID# 2114).[7]  Herrell was stopped by the police at a rest stop approximately an hour before 10:10 p.m. (*id.* at PageID# 2747), the last time Herrell was known to be alive (*id.* at PageID# 2595, 2599), and the rest stop is approximately 48–54 minutes away from Herrell's home.  (*Id.* at PageID# 3831).

In closing arguments, both the state and Brenson's counsel argued that time of death supported their case.  The state argued that Herrell died as early 10:00 p.m. on June 11, 2000 (*id.* at PageID# 3990), and the best evidence was the lapse between the two known phone calls—the one where he answered on June 11, 2000, at 10:10 p.m., and the one that went unanswered the next morning.  (*Id.* at PageID# 4001, 4095).

Brenson's counsel argued that Herrell died the morning of June 12, 2000, when Brenson was in the hospital in Toledo.  (*Id.* at PageID# 4060).  Brenson's counsel argued that the heat in

---

[7]        The Court of Appeals concluded that "the jury did not create a manifest injustice by concluding that appellant was guilty of the crimes charged in the indictment."  *Brenson*, 2010 -Ohio- 4645, (Doc. 10 at PageID# 554).

the house accelerated rigor mortis, which was fully fixed when the body was found and easily broken at the time of autopsy on June 13, 2000, at 10:00 a.m.  (*Id.* at PageID# 4064).  He also argued that circumstantial evidence in the house suggested the murder occurred in the morning of June 12, 2000, including Herrell's normal morning routine, the presence of dog food on the counter, and the fact that the dog was locked in the master bedroom with no evidence that he had soiled the carpet.  (*Id.* at PageID# 4066–4067).  Brenson's counsel argued that the stomach contents, including the digested food and potassium pills suggested Herrell was killed in the morning and not at night.  (*Id.* at PageID# 4067–4070).

Dr. Grey's report offers an expert opinion that criticizes Dr. Dean's preparation for offering an opinion on time of death.  But it does not offer an opinion that the time of death, to a reasonable degree of scientific certainty, was something other than the range to which Dr. Dean testified.  Indeed, Dr. Grey acknowledges that, under the circumstances, time of death was "at best an estimate based on highly variable factors."  (Doc. 1-2 at PageID# 39).  Dr. Grey offers the same circumstantial evidence argued by Brenson's counsel in closing argument and concludes that it supports a finding that Herrell was killed the morning of June 12, 2000.  But he does not say that Herrell could not have been killed the evening of June 11, 2000.

In sum, the new pathologist report could have provided expert support to the arguments made by counsel in closing.  At the same time, the jury heard the facts upon which Dr. Grey's opinion is based and rejected the defense theory that Herrell was killed at a time when Brenson was in the hospital in Toledo.  Brenson cannot demonstrate that no reasonable juror would vote to find him guilty if they heard of Dr. Grey's opinion and he therefore cannot pass through the actual innocence gateway to excuse his untimely Third Habeas Petition.

The Third Habeas Petition is time-barred.  Brenson has not carried his burden to show that he is entitled to tolling or any equitable exception.  As a result, the Petition should be dismissed as untimely.

## IV.  PROCEDURAL DEFAULT

Even if the Court were to overlook the untimeliness of the Third Petition, the claims should all be dismissed as procedurally defaulted.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to first present those claims to the state courts for consideration.  28 U.S.C. § 2254(b), (c).  If the prisoner fails to do so but still has an avenue open to present the claims, then the petition is subject to dismissal for failure to exhaust state remedies.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)).  Where a petitioner has failed to exhaust claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas."  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991), *holding modified by Martinez v. Ryan*, 566 U.S. 1 (2012).

Over time, the term "procedural default" has come to describe a situation where a person convicted of a crime in a state court fails (for whatever reason) to properly present a particular claim to the highest court of the state so that the state has a fair chance to correct any errors made in the course of the trial or the appeal, before a federal court intervenes in the state criminal process.  This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review."  *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)).  One of the aspects of "fairly

presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted. That means that if the claims are not presented to the state courts in the way state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court. As the Supreme Court found in *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to [the] failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case – that is, they are "procedurally defaulted." It is well settled that "[a] common example of a procedural default is a failure to raise a claim in state court in a timely manner." *Gibbs v. Huss*, 12 F.4th 544, 550 (6th Cir. 2021).

To determine whether procedural default bars a habeas petitioner's claim, courts in the Sixth Circuit engage in a four-part test. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also McNeill v. Bagley*, 10 F.4th 588, 595 (6th Cir. 2021) (citing the four-part *Maupin* standard). First, the court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with the rule. Second, the court must determine whether the state courts actually enforced the state procedural sanction. Third, the court must determine whether the forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. Finally, if the court determines that a state procedural rule was not complied with and the rule has an adequate and independent state ground, then the petitioner may still obtain review of his or her claims on the merits if the petitioner establishes: (1) cause sufficient to excuse the default and (2) that he or she was actually prejudiced by the alleged constitutional error. *Maupin*, 785 F.2d at 138. To establish cause, a petitioner must show that "some objective factor external to the defense"

impeded the petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The petitioner bears the burden of showing cause and prejudice. *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001).

Respondent argues that Brenson's claims are procedurally defaulted because he raised them in an untimely postconviction motion and then filed an untimely appeal. (Doc. 12 at PageID# 4275–4276). The Court agrees. The Delaware County Court of Common Pleas determined that the motion was untimely as either a postconviction petition under O.R.C. § 2953.23(A)(1) or as a motion for a new trial under Ohio Crim. R. 33. (Doc. 10 at PageID# 1014–1019). *See Johnson v. Bobby*, No. 2:08-CV-55, 2021 WL 6125049, at *134 (S.D. Ohio Dec. 28, 2021) (citing *Stojetz v. Ishee*, 892 F.3d 175, 205–06 (6th Cir. 2018)) ("Section 2953.23(A)(1) is an independent and adequate state ground of decision barring federal habeas review"); *Veliev v. Warden, Chillicothe Corr. Inst.*, No. 2:12-CV-00346, 2014 WL 4805292, at *11 (S.D. Ohio Sept. 26, 2014) (citing *Moore v. Brunsman*, No. 3:08 CV 2895, 2010 WL 425055, at *15 (N.D. Ohio Jan. 26, 2010) ("Rule 33 is a firmly established Ohio procedural rule capable of providing the basis for a finding of procedural default in a federal habeas matter."). Court of Appeals dismissed Brenson's appeal of his postconviction motion as untimely filed (Doc. 10-1 at PageID# 1093) and the Supreme Court of Ohio declined jurisdiction. (*Id.* at PageID# 1117). Brenson's failure to timely appeal resulted in a second procedural default. *See Hart v. Ohio Adult Parole Auth.*, No. 1:12-CV-698, 2013 WL 3567483, at *8 (S.D. Ohio July 11, 2013), *report and recommendation adopted*, No. 1:12CV698, 2013 WL 3983087 (S.D. Ohio Aug. 1, 2013), *report and recommendation adopted*, No. 1:12CV698, *Hart v. Ohio Adult Parole Auth.*, No. 1:12CV698, 2013 WL 3983087 (S.D. Ohio Aug. 1, 2013).

24

Brenson's Traverse does not include arguments for "cause" and "prejudice" to excuse the procedural default of his claims.  As noted above, Brenson argues that he is eligible for the actual innocence gateway.  For the same reasons it does not excuse the timeliness of the Third Habeas Petition, actual innocence is not a basis on which the Court can find to excuse procedural default.

## V.    ALTERNATIVE MERITS REVIEW

Notwithstanding the procedural barriers to relief, Brenson fails to establish a substantial constitutional claim.  *See Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008), *as amended* (July 7, 2008).

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), and the jurisprudence of procedural default guide this Court's review of Brenson's petition.

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by AEDPA.  The United States Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy."  *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Court of Appeals for the Sixth Circuit has explained the meaning of the standards found in § 2254(d)(1):

> Under the "contrary to" clause, a federal habeas court may grant the writ "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies the law or bases its decision on an unreasonable determination of the facts, in light of the record before the state court. *Harrington v. Richter*, 562 U.S. 86, 100, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011); *Williams*, 529 U.S. at 412–13, 120 S.Ct. 1495.

*Lang v. Bobby*, 889 F.3d 803, 810 (6th Cir. 2018).

Moreover, under § 2254(d)(2), a state court's factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, a state court's factual findings are "only unreasonable where they are 'rebutted by clear and convincing evidence' and do not have support in the record." *Moritz v. Woods*, 692 F. App'x 249, 254 (6th Cir. 2017) (quoting *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017)) (internal quotation marks omitted). And "[f]actual determinations by state courts

are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]"  *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

The burden of satisfying AEDPA's standards rests with the petitioner.  *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## A.    Grounds One and Four

In Ground One, Brenson contends that he is entitled to habeas relief because the Delaware County Court of Common Pleas denied his motion for a new trial without holding an evidentiary hearing.  (Doc. 1 at PageID# 6, Doc. 1-1 at PageID# 22–27).  In Ground Four, Brenson contends he is entitled to habeas relief because the Delaware County Court of Common Pleas "recharacterize[ed] [his] irregular motion for a new trial."  (Doc. 1 at PageID# 11, Doc. 1-1 at PageID# 22–27).  Respondent argues that these two grounds for relief are non-cognizable in federal habeas review.  (Doc. 12 at PageID# 4281).  The Court agrees.

Brenson argues in Ground One that the trial court improperly applied Ohio law to his "Motion to Set Aside Convictions or Order a New Trial" when it was denied without an evidentiary hearing.  He argues in Ground Four that the trial court improperly applied Ohio law when it interpreted his motion as a postconviction petition instead of a motion for a new trial.  Setting aside the fact that the trial court applied the standard for motions for a new trial and postconviction petitions to Brenson's motion (Doc. 10-1 at PageID# 1014–1019), Grounds One and Four state no grounds for federal habeas corpus relief because they challenge the way the Delaware County Court of Common Pleas conducted its postconviction procedures.  *See Pennsylvania v. Finley*, 481

U.S. 551, 557 (1987) (holding that states have no constitutional obligation to provide postconviction remedies); *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 854 (6th Cir. 2017) (quoting *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) ("habeas corpus cannot be used to mount challenges to a state's scheme of post-conviction relief."); *Shalash v. Gray*, No. 20-3772, 2020 WL 8182803, at *4 (6th Cir. Dec. 10, 2020). (holding that a challenge to a state court's failure to hold an evidentiary hearing on a postconviction motion is a challenge to state post-conviction proceedings, rather than to the underlying conviction itself). Grounds One and Four are not cognizable on habeas review.

### B.     Ground Two

In Ground Two, Brenson contends that his counsel was ineffective for failing to investigate, interview witnesses, and retain an expert to provide testimony at trial regarding the victim's time of death. (Doc. 1 at PageID# 8, Doc. 1-1 at PageID# 27–35).

"In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . to Assistance of Counsel for his defence." U.S. CONST. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principles governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance, a defendant must show both deficient performance and prejudice. *Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010). As to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the

> evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, 466 U.S. at 689.

As to the second prong, the Supreme Court held: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to overcome confidence in the outcome."  (*Id.* at 694).

When an exhausted claim of ineffective assistance of trial counsel is raised in a federal habeas petition, review under AEDPA is "doubly deferential."  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  That is, "*Strickland* requires deference to counsel and AEDPA requires deference to the state court."  *Moody v. Parris*, No. 20-5299, 2022 WL 3788503, at *4 (6th Cir. Aug. 30, 2022).  The question then is not whether trial counsel was ineffective, but "whether the state court's application of the *Strickland* standard was unreasonable."  *Harrington*, 562 U.S. at 101.  The Supreme Court clarified the double deference that is due:

> This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

(*Id.*) (internal citation omitted).

Ground Two fails the *Strickland* test for the same reasons explained in the Actual Innocence discussion in Section III(B), above.  Dr. Grey's expert report merely supports the same

time of death theory based on the circumstantial evidence that Brenson's counsel argued at trial. In other words, in his post-conviction efforts Brenson was unable to find an expert who could say, to a reasonable degree of medical certainty, that the victim died at a time when Brenson could not have committed the murder. *See Tinsley v. Million*, 399 F.3d 796, 806 (6th Cir. 2005) (finding that a habeas petitioner fails to demonstrate prejudice when he cannot come forward with evidence that there was an expert who would have reached an opinion contrary to the opinion of the state's expert). For this reason, Ground Two fails the *Strickland* test and is without merit.

## C.    Ground Three

In Ground Three, Brenson contends that he is entitled to habeas relief because the prosecutor engaged in misconduct by asking the pathologist, Dr. Dorothy Dean, questions that were not a topic of her written report. (Doc. 1 at PageID# 9, Doc. 1-1 at PageID# 29, 35–37). Specifically, Brenson argues that questions regarding time of death were improper. (Doc. 1 at PageID# 9).

"On habeas review, a court's role is to determine whether [alleged prosecutorial misconduct] was so egregious as to render the entire trial fundamentally unfair. In conducting such a determination, a reviewing court first decides whether the alleged misconduct was improper and, if it was, then decides whether the misconduct was so flagrant as to constitute a denial of due process and warranting granting a writ." *Millender v. Adams*, 376 F.3d 520, 526 (6th Cir. 2004) (citation modified).

Brenson cannot demonstrate that he is entitled to habeas relief on Ground Three. As discussed in Section III(B), Brenson's trial was not rendered fundamentally unfair based on the pathologist's testimony. Indeed, Dr. Dean testified on direct examination about the timing of rigor mortis, but it was both Allen and Brenson's defense counsel that elicited the testimony from Dr.

30

Dean about the specific time of death. (Doc. 11-1 at PageID# 2438–2450). Moreover, Brenson's counsel was provided with ample opportunity to elicit evidence and argue a theory that the circumstantial evidence at the scene supported a conclusion that the victim died on the morning of June 12, 2000. (*Id.* at PageID# 4060–4070). What's more, Brenson's postconviction expert criticized Dr. Dean's methods, but did not conclude that the range for time of death she offered was unsupported by science. (Doc. 1-2).

Ground Three lacks merit.

## VI. MOTION FOR EVIDENTIARY HEARING (Doc. 18)

On October 20, 2025, Brenson filed a Motion for an Evidentiary Hearing for Breach of Contract. (Doc. 18). The Motion is opposed. (Doc. 19). Brenson argues that he should be granted a hearing because the state entered his grand jury testimony into evidence at his trial despite assuring his counsel that the testimony would not be used against him. (*Id.* at PageID# 4433). But Brenson's Third Habeas Petition does not raise a claim that he should be granted relief for this reason. (Doc. 1). Nor has Brenson sought leave to amend his petition.

Even if Brenson did seek leave to amend his Third Habeas Petition, it would be denied as futile because the claim is time-barred. 28 U.S.C. § 2242 provides that a habeas corpus petition "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." The general standard for considering a motion to amend under Fed. R. Civ. P. 15(a) was enunciated by the United States Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962):

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of any allowance of the amendment,

31

> futility of amendment, etc. — the leave sought should, as the rules
> require, be "freely given."

371 U.S. at 182.  *See also Fisher v. Roberts*, 125 F.3d 974, 977 (6th Cir. 1997) (citing *Foman* standard).

In considering whether to grant motions to amend under Rule 15, a court should consider whether the amendment would be futile, i.e., if it could withstand a motion to dismiss under Rule 12(b)(6).  *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir. 1992); *Martin v. Associated Truck Lines, Inc.*, 801 F.2d 246, 248 (6th Cir. 1986); *Marx v. Centran Corp.*, 747 F.2d 1536 (6th Cir. 1984).  Brenson's putative amendment would not survive a motion to dismiss because it would be time-barred.

Fed. R. Civ. P. 15(c)(2), provides that amendments relate back to the date of the original pleading when the claim asserted in the amended pleading "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."  But "[a]n amended habeas petition does not relate back . . . when it asserts a new ground for relief supported by facts that differ in both time and type from those set forth in the original pleading."  *Mayle v. Felix*, 545 U.S. 644, 645 (2005).

Brenson's assertion that the state breached an agreement not to use his grand jury testimony against him at trial differs in both time and type from the four claims found in his Third Habeas Petition, which all relate to issues concerning the victim's time of death.  Because the amendment

32

would not relate back, and because Brenson's conviction was final on October 30, 2023,[8] any amendment would be too late by more than two years.[9]

Respondent argues that Brenson's motion for an evidentiary hearing should be denied because Brenson cannot meet the standard set forth in 28 U.S.C. § 2254(e)(2). (Doc. 19). Specifically, Respondent argues that Brenson failed to act diligently because he was aware of the factual predicate and failed to raise the claim when he moved to suppress his grand jury testimony, in his direct appeal, or with any other potential avenues for relief in state court. (*Id.* at PageID# 4506). The Court need not resolve the applicability of 28 U.S.C. § 2254(e)(2) to Brenson's motion. Brenson's motion is denied because the claim is not before the Court and any proposed amendment would also be denied as futile.

That said, the state did not contradict Brenson's allegation that the state made a deal with him that his grand jury testimony would not be used against him at trial.[10] Brenson, on the other hand, produced a document that indicates the deal was, in fact, made. (Doc. 18 at PageID# 4444). Brenson produced a Delaware Police Department investigation report, which documents, "Prosecutor Whitney said that if Brenson does testify, he would agree not to use anything he says against him in any possible criminal trial." (*Id.*). Based on the information before the Court,

---

[8] Brenson states in his motion that he was aware of the deal before his 2008 grand jury testimony. (Doc. 18 at PageID# 4433). Accordingly, the terms of 28 U.S.C. § 2244(2)(B)(i) do not apply.

[9] Even if the amendment did relate back, it would be untimely because the Third Habeas Petition is also untimely.

[10] Referencing a trial court order, Respondent notes that Brenson was Mirandized before his 2008 grand jury testimony. (Doc. 19 at PageID# 4506). The Court is not in possession of the transcript. In any event, a Miranda warning was given before his 2008 grand jury testimony does not negate Brenson's allegation that a deal was made before his grand jury testimony in 2000.

Brenson's allegation is concerning.  But, again, Brenson's failure to raise the claim in time prevents him from pursuing it now in this Court.[11]

## VII.    CONCLUSION

It is hereby **ORDERED** that Brenson's Motion for an Evidentiary Hearing (Doc. 18) is **DENIED.**

Brenson's petition is time-barred.  It is therefore **RECOMMENDED** that the habeas petition be **DENIED,** and this action be **DISMISSED WITH PREJUDICE.**

For the foregoing reasons, the Undersigned **RECOMMENDS:**

1. Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2. A certificate of appealability should not issue with respect to the petition because petitioner has not stated a "viable claim of the denial of a constitutional right" or presented an issue that is "adequate to deserve encouragement to proceed further."  *See Slack v. McDaniel*, 529 U.S. 473, 475 (2000) (*citing Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3. With respect to any application by a petitioner to proceed on appeal *in forma pauperis*, the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore **DENY** Petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman*, 117 F.3d 949, 952 (6th Cir. 1997).

---

[11]    The claim also appears to be unexhausted and potentially procedurally defaulted, as the record does not indicate it was ever raised in any state court proceeding.

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence, or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo* and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

**IT IS SO RECOMMENDED**.


Date: January 12, 2026                                    */s/ Kimberly A. Jolson*
                                                         Kimberly A. Jolson
                                                         UNITED STATES MAGISTRATE JUDGE